Brooke Weitzman, Esq., SBN 301037
Andrea Smith, Esq., SBN 294163
ELDER LAW AND DISABILITY
RIGHTS CENTER
asmith@eldrcenter.org
1535 E 17th Street, Suite 110
Santa Ana, CA 92705
Ph: (714) 617-5353

Michelle Uzeta, Esq., SBN 164402
DISABILITY RIGHTS EDUCATION
AND DEFENSE FUND
muzeta@dredf.org
3075 Adeline Street, Suite 210
Berkeley, CA 94703
Ph: (510) 644-2555, Ext 5237

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Linda Harding** | Case No.: 8:24-cv-00040 |
| Plaintiff, | **COMPLAINT for Injunctive Relief and Damages for Violations of:** |
| v. | |
| **Aperto Property Management, Inc.; Park Stanton Place, a California Limited Partnership; Foundation for Affordable Housing II, Inc.; and Does 1-10 inclusive** | 1. The Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq*.; |
| Defendants | 2. California Fair Employment and Housing Act, Cal. Gov't Code § 12955 *et seq*.; |
| | 3. California Unruh Civil Rights Act, Cal. Civ. Code § 51 *et seq*.; |
| | 4. California Disabled Persons Act, Cal. Civ. Code § 54.1 *et seq*.; and |
| | 5. Negligence, Cal. Civil Code §1714. |

Complaint

**INTRODUCTION**

1.      This is an action for injunctive relief and damages against Aperto Property Management, Inc., Park Stanton Place, a California Limited Partnership, and Foundation for Affordable Housing II, Inc. (collectively "Defendants"), for housing discrimination based on disability.

2.      Plaintiff Linda Harding ("Plaintiff") lives with compound disabilities and was without housing for approximately seventeen years before she secured a Section 8 federally-subsidized housing voucher ("Voucher"). With the Voucher she applied for a unit owned and operated by Defendants. After she was approved for an apartment, but before signing the lease, she contracted COVID-19.

3.      Plaintiff's disabilities were exacerbated when she contracted COVID-19 and put her at increased risk of harm due to the virus. Plaintiff had to be hospitalized and quarantined for treatment to avoid a poor outcome.

4.      Defendants typically require lease signing to be done in person. Because of her disabilities, exacerbated by COVID-19, Plaintiff was unable to sign her lease in person. Plaintiff made multiple reasonable accommodation requests to sign her lease in alternative ways. These requests were denied. Additionally, Plaintiff's attempts to engage in an interactive process with Defendants to figure out a way to execute the lease agreement in an alternative manner were rebuffed. Rather than accommodate Plaintiff, Defendants rented the unit she was approved for to someone else, leaving her without housing and causing her to experience difficulty, discomfort, and out-of-pocket losses.

5.      Defendants' refusal to modify their policy that tenants sign their lease in person, allow Plaintiff to sign her lease in alternative ways, delay the lease signing until the exacerbation of Plaintiff's disabilities was treated, or

engage in an interactive process with Plaintiff was in willful disregard of her rights under federal and state fair housing law. Defendants knew or should have known the significant harms their acts and omissions would cause Plaintiff, but discriminated against her anyway.

6.     Plaintiff brings this action seeking injunctive relief, statutory penalties, actual and punitive damages, reasonable attorney's fees, and costs of suit.

<strong>JURISDICTION & VENUE</strong>

7.     Pursuant to 28 U.S.C. § 1331 jurisdiction is proper for claims that arise under the laws of the United States, including the Fair Housing Act, 42 U.S.C. §§ 3601-3619.

8.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine Plaintiff's state law claims because they are related to Plaintiff's federal claims and arise from a common nucleus of operative facts. Plaintiff's state and federal claims form part of the same case or controversy under Article III of the United States Constitution.

9.     Venue is proper in the Central District of California under 28 U.S.C. § 1391(b)(2) because the events or omissions giving rise to Plaintiff's claims occurred in this district, the property that is the subject of the action is situated in this district, and the Defendants conduct business in this district.

<strong>PARTIES</strong>

10.     Plaintiff is, and at all times relevant herein was, a resident of the State of California.

11.     Defendant Aperto Property Management, Inc. is a California corporation with a primary business address at 2 Venture Suite 525, in the City of Irvine, California.

Complaint

12.     Defendant Park Stanton Place, a California Limited Company is a California limited partnership with a primary business address of 270 N Canon, Second Floor, in the City of Beverly Hills, California. Park Stanton Place is the property owner of the unit Plaintiff was approved to rent.

13.     Defendant Foundation for Affordable Housing II, Inc. is a California corporation with a primary business address of 69 NW Newport Avenue, Suite 200, in the City of Bend, Oregon. It is the managing general partner and owner of Park Stanton Place.

14.     Plaintiff is currently unaware of the true identities of Does 1-10, inclusive, and will seek leave to amend her Complaint when the true names, capacities, connections, and responsibilities of those defendants are ascertained.

15.     Plaintiff is informed and believes, and on that basis alleges that each of the Defendants is the agent, ostensible agent, alter ego, master, servant, trustor, trustee, employer, employee, representative, franchiser, franchisee, lessor, lessee, joint venturer, parent, subsidiary, affiliate, related entity, partner, and/or associate, or such similar capacity, of each of the other Defendants, and was at all times acting and performing, or failing to act or perform, within the course and scope of such capacity, and with the authorization, consent, permission or ratification of each of the other Defendants, and is personally responsible for the acts and omissions of the other Defendants in causing the violations and damages complained of herein. Each Defendant participated, directed, and/or approved or ratified each of the acts or omissions of each of the other Defendants, as herein described directly or indirectly.

\\

\\

\\

4

Complaint

**FACTUAL ALLEGATIONS**

16.    Plaintiff is a senior citizen as defined by California Civil Code section 51.3.5(d)(2).

17.    Plaintiff was without stable housing for approximately seventeen (17) years until on or around April 13, 2022.

18.    Plaintiff has physical and mental disabilities that substantially limit her mobility, cognition, and intellectual processing and necessitate regular hospital and care facility stays.

19.    The Park Stanton Place ("Property") is a multi-family apartment complex located at 7622 Katella Avenue in the City of Stanton, California. Aperto Property Management is the property manager at the Property.

20.    The Property has 335 senior units and participates in the Low-Income Housing Tax Credit ("LIHTC") program. It may accept other government funds through additional programs.

21.    Defendant Aperto Property Management, Inc. owns, operates and/or manages the Property. At all times relevant herein, Aperto Property Management acted as an agent of Part Stanton Place.

22.    Defendant Park Stanton Place, a California Limited Partnership, owns, operates and/or manages the Property.

23.    Defendant Foundation for Affordable Housing II, Inc. owns, operates and/or manages the Property.

24.    Plaintiff received her Voucher on or around October 2021. Plaintiff believes and was informed that her case worker obtained at least one extension, before April 6, 2022.

25.    Orange County Housing Authority opened its waitlist in 2012 to

Complaint

50,000 people and next opened its waitlist in 2023 to 12,000 people.[1] An unhoused person in Orange County can apply for housing opportunities through the County run Coordinated Entry System (hereafter "CES"). CES policies dictate how a person is added to the system, how a person stays active in the system, and when a person is matched with housing opportunities including a Voucher.[2] Plaintiff lacked stable housing for approximately seventeen years. She faced challenges entering the CES system and navigating the CES system.

26.     Once an individual receives a Voucher, they are often unable to secure a lease before the Voucher expires.[3] Plaintiff's apartment search was even more difficult because of her disability-related needs, including the need to be near her medical providers and her need for onsite parking. Upon receipt of a Voucher, Plaintiff and her case manager began working diligently to find and apply for units that could meet her disability-related needs.

27.     A one-bedroom unit was identified at the Property. It met Plaintiff's disability-related needs and was listed at $1700 per month, a rent amount that her case manager expected could be approved by the Housing Authority for her Voucher.

28.     The primary contact responsible for leasing the Property was Yvette Wright, on information and belief the Property Assistant Manager (hereafter "Property Manager"). Ms. Wright was and is, on information and

---

[1] https://voiceofoc.org/2023/09/orange-countys-housing-voucher-application-ends-tomorrow/

[2] https://ceo.ocgov.com/sites/ceo/files/2022-09/CES%20POLICY%20FINAL_220928_APPROVED.pdf

[3] "OC Housing Agencies Face Unprecedented Number of Housing Vouchers Before They Expire," *Los Angeles Times* April 14, 2022

Complaint

belief, an employee and/or agent of Aperto Property Management with authority to act on behalf of the Property.

29.     Giselle Masedo (hereafter "Case Manager") was Plaintiff's Housing Navigator at Illumination Foundation. Illumination Foundation serves as an Orange County funded designated access point for CES in Orange County and provides services to people experiencing homelessness.

30.     Plaintiff through the assistance of the Case Manager, completed and submitted all paperwork required by Defendants to apply for the unit at the Property on or around January 26, 2022, and was approved on or around January 27, 2022.

31.     On or around January 27, 2022, Plaintiff was tested positive for COVID-19. Because of her compound disabilities, and the way COVID might exacerbate those disabilities, she was immediately hospitalized to ensure prompt medical support would be available to manage her compound disabilities.

32.     On February 1, 2022, Property Manager emailed the Case Manager that the inspection for the apartment was complete[4] and requested a move-in date. The Case Manager informed the Property Manager that Plaintiff was in the hospital and requested a virtual leasing option as a disability accommodation. The Property Manager ignored the accommodation request and responded asking if Ms. Wright could move in on February 3, 2023.

33.     Plaintiff's disability-related complications resulted in hospitalization and subsequent nursing home care. Because of Plaintiff's disabilities, she suffered major complications after she contracted COVID-19.  When she was released from the hospital her disabilities required that

_____

[4] A Voucher holder is required to have the unit inspected by the housing authority before federal funds can be used for the rental subsidy.

7

she be transferred to a nursing facility for an extended stay and further assistance with her daily activities during recovery. Upon arrival at the nursing facility, Plaintiff was subject to a mandatory 14-day quarantine. During her recovery, she had significantly increased difficulty engaging in basic life activities, such as walking, talking, reading, and processing information.

34.     On February 7, 2022, Plaintiff, through her Case Manager, emailed the Property Manager again requesting the reasonable accommodations of a virtual lease signing and informing the Property Manager that Plaintiff was temporarily in a nursing facility with a 14-day quarantine for disability-related care. Therefore, Plaintiff was still not physically able to appear in person to execute the lease.

35.     On February 7, 2022, the Property Manager responded that she spoke with Regional Manager of Aperto Property Management, Inc., Martha Reyes ("Regional Manager"), and represented that the Regional Manager would not allow Plaintiff to sign her lease virtually or hold the unit for Plaintiff to sign in person when the limitations imposed by her disabilities were better managed so she could leave the facility.

36.     After the request for reasonable accommodation was summarily denied by Defendants, Plaintiff again tried to begin the interactive process offering a variety of options that would permit her to lease the unit despite her disability-related limitations including:

     i.   Electronic signature

     ii.  Physical signature done over video from the facility to ensure Defendants could talk to and see Plaintiff while she signed.

     iii. Reschedule lease signing and move in date until Plaintiff completed her medically required quarantine at the nursing facility.

iv.  Payment of a per diem holding fee to compensate Defendants for lost revenue until Plaintiff was medically cleared to attend an in-person lease signing despite her disability related limitations.

v.  Other accommodations as Defendants might see fit to ensure Plaintiff would not incur the physical and emotional harm of losing this unit.

37.     On February 8, 2022, Defendants again summarily denied the request for reasonable accommodations and declined all proposed alternatives to allow Plaintiff access to the unit a person without her disabilities would have had.  Defendants failed to explain why the accommodations could not be provided, failed to suggest any alternatives, and refused to engage in any interactive process to try and explore with Plaintiff an accommodation that might work to maintain the housing for which she had been accepted and approved.

38.     The Elder Law and Disability Rights Center ("ELDR"), on behalf of Plaintiff, submitted a demand letter on or around February 8, 2022, to Defendants with the request for reasonable accommodations. ELDR repeated the options for reasonable accommodations made previously by Plaintiff in an attempt to meet any needs of the Defendants. ELDR also reiterated the request to engage in an interactive process. Defendants did not respond.

39.     On February 9, 2022, ELDR spoke with Defendants through the Property Manager and Regional Manager to follow up on Plaintiff's unanswered request for reasonable accommodations. Defendants informed ELDR that the unit Plaintiff was approved for was placed back on the market and no longer unavailable.

40.     Defendants stated that because the Property was "tax-credited," there were limits on how long management could hold a unit for a tenant. Defendants declined provide any code, regulation, or other authority to support the alleged prohibition on holding the unit. Defendants did not provide any lawful basis to circumvent federal and state requirements to provide reasonable accommodations in the rental of housing.

41.     Defendants alleged they had already "violated" internal policy by holding the unit two weeks for Plaintiff from the date of approval and stated that they could not do that again. Defendants stated that they could not accept a per diem payment to hold the unit because it would appear as a form of favoritism and that any form of remote signing would violate Defendants corporate policy. Defendants again summarily denied the request for reasonable accommodations without statutory justification for these denials and declined to engage in the interactive process.

42.     Defendants stated that their attorney would contact ELDR but declined to provide contact information for this attorney. No attorney representing Defendants contacted ELDR to follow up on these denials.

43.     Plaintiff and her case manager again worked diligently attempting to secure a unit that could meet her disability related needs with the Voucher expiration date impending. Despite finding a unit, she feared she would lose it again up until she got the keys to her new residence because of the actions of Defendants.

44.     Upon release from the nursing facility Plaintiff was forced to find places to stay safely until April 13, 2022, when she began her current rental unit at Metro Park.

45.     She suffered severe emotional distress, including depression and anxiety. This stress exacerbated Plaintiff's digestive pre-existing conditions.

46.    Metro Park is not as suitable for Plaintiff's disabilities as the Property would have been.

47.    Plaintiff's lease at Metro Park is $1725/month, $25 more than the $1700 per month she would have paid at the Property. In addition, she must pay the cost of electricity at approximately $60-$80 per month whereas electricity was included in the rental rate at the Property. These additional costs are a considerable hardship given her limited income.

48.    The closest grocery store to Plaintiff is Stater Bros, which is more expensive than Food4Less, the closest grocery store to Property. Plaintiff estimates that she spends an additional $30 a month on groceries at Stater Bros, another considerable hardship for her.

49.    Plaintiff was finally reimbursed for the money orders to hold the unit at Property in early July 2022, approximately five months after Defendants refused to accommodate her so she could sign the lease at the Property. This undue delay caused Plaintiff considerable financial stress given her limited income. She did not have enough money to meet her basic needs for food, gas, and other necessities.

50.    On information and belief, the Property had a parking space that would have been immediately available to Plaintiff upon move-in. By contrast, Plaintiff had to wait until December 2022 to receive a parking spot at Metro Park because of a lack of parking availability for residents.

51.    Because a parking space was unavailable to her at Metro Park, Plaintiff was forced to use an off-site parking every time she used her vehicle. Due to her disabilities, Plaintiff has limited mobility. As a result of her mobility impairments and other disabling conditions, she has trouble walking extended distances because of her disabilities.

52.    The extended distance Plaintiff was forced to walk from off-site parking spaces to her apartment exacerbated her disabilities, causing her

11

pain. When Plaintiff attempted to park her car closer to her unit for her safety, her car was towed, causing her to experience significant distress and to incur costs. The increased cost and distress eventually forced her to give up her car entirely.

53.     Plaintiff now must rely on public transportation but due to her disabilities, limited stops, and limited schedules, it has not reliably allowed her to get to her appointments the way her car did. She finds it difficult to navigate public transportation with her walker. In addition, many of her destinations require multiple bus transfers, thus considerably increasing travel time and exacerbating disability-related pain. As a result, she is not able to get to her appointments as well as she would have been had she been housed in the Defendants unit.

54.     Metro Park is also further from Plaintiff's support network than the Property. Plaintiff's distant location has cut her off from her social network so that she cannot visit her friends, and her friends visit her less often. This loss has increased Plaintiff's depression, for which she is now receiving counseling. She also has less access to friends who can provide her with assistance for disability related needs.

55.     The Metro Park apartment is farther from Plaintiff's doctor. With the limited access to her car initially, the increase costs of maintaining her car later, and her dependence on public transportation currently, she has missed some appointments. While the difference in cost or time may be minimal to others, with her disabilities, these are significate to her and at times, she was not up to making the longer trip.

56.     Plaintiff also has safety concerns about the Metro Park Apartment. At the Metro Park Apartment, Plaintiff hears screaming at night and has seen somebody climb over the fence to enter the property at night. Plaintiff is afraid to leave the unit at night as a result.

Complaint

57.     The Property was Plaintiff's housing of choice. It was conveniently located, accessible to her, within her budget, and provided access to amenities and services important and necessary to her. As a direct cause of Defendant's discriminatory acts and omissions, Plaintiff was forced to enter into a lease at a less desirable property, at higher cost, with less access to the amenities and services important to her. The alternative was to remain unhoused.

58.     Allowing Plaintiff to sign her lease electronically or virtually would not have created an undue burden for Defendants. Delaying Plaintiff's lease signing until she completed her 14-day COVID-19 quarantine at the nursing facility would not have created an undue burden for Defendants.

59.     Acceptance of a per diem holding fee until Plaintiff was able to sign her lease in person would not have created an undue burden for Defendants. Allowing Plaintiff to sign her lease electronically or virtually would not have resulted in a fundamental alteration of the nature of Defendants' housing program. Nor would a slight delay or acceptance of a per diem holding fee until she was able to sign in person.

60.     There is no statutory or regulatory requirement applicable to the Property that would have prohibited Defendants from accommodating Plaintiff as requested.

61.     At no time relevant herein did Defendants engage in, or offer to engage in, an "interactive process" with Plaintiff or her representatives to exchange information to identify, evaluate, and implement a reasonable accommodation that would allow her equal opportunity to use and enjoy the housing opportunity at the Property.

62.     At no time relevant herein did Defendants engage in, or offer to engage in, an "interactive process" with Plaintiff or her representative to

Complaint

explore and determine if alternatives to the reasonable accommodations she had requested were feasible.

63.     As a person/entity that is in the business of renting housing, Defendants knew or should have known of their obligation to reasonably accommodate Plaintiff and obligation to engage in an "interactive process" with Plaintiff. Further, they were informed of their obligations by the Case Manager on February 7, 2022, and by Plaintiff's attorney on February 8, 2022, and on a February 9, 2022 telephone call. Regardless of this knowledge, Defendants failed to accommodate Plaintiff or otherwise comply with the law.

64.     As the direct and proximate result of Defendants' acts and omissions as alleged herein, Plaintiff has suffered and will continue to suffer damages, including deprivation of the right to equal housing opportunity, increased expenses, loss of civil rights, frustration, difficulty, severe emotional distress, embarrassment, and inconvenience as well as physical injury.

65.     Defendants' refusal to provide Plaintiff with an accommodation for signing the lease caused Plaintiff considerable distress. From the moment Plaintiff was notified that she might lose the unit because of her hospitalization, she was distraught. Plaintiff was very depressed, frequently cried, and experienced worse acid reflux because of the stress of potentially losing the apartment. Plaintiff had been unhoused and endured much of the trauma associated with being unhoused, for seventeen years before receiving a Voucher and approval for the unit at the Property. When she learned she had been accepted at the Property after this long period, she believed that she would finally be safe from the dangers of remaining unhoused. Defendants inflicted severe emotional distress on Plaintiff when they refused her requests for reasonable accommodations, and abruptly rescinded their

Complaint

offer of housing by relisting the unit for which she had been approved. Defendants' actions forced her to remain unhoused immediately while receiving disability-related treatment, during recovery from COVID-19, and while the exacerbations of her disabilities became managed.

66.     Defendant was aware by participating in a voucher program and signing the paperwork required by the Anaheim Housing Authority to participate in the program that Plaintiff's housing voucher was time-limited and that losing the unit at the Property might mean losing that assistance entirely. They violated her rights anyway.

67.     Plaintiff spent the next two months without stable housing, not knowing how soon another unit would become available, whether she would qualify, and saddled with the burden that she would have to endure the uncertainty of the application process again. Plaintiff also suffered from emotional distress having to navigate a process that was confusing to her immediately after a lengthy hospitalization. Defendants' arbitrary withdrawal of its apartment offer resulted in severe emotional distress giving Plaintiff the hope of stable and safe housing that met her disability-related needs, and then ripping the hope from her while she was in a medical recovery.

68.     Plaintiff has been, and will continue to, be irreparably harmed financially by Defendants' refusal to accommodate Plaintiff as requested because she now must live in a more expensive apartment when she is very low-income, incur higher food costs, fund additional travel costs to access basic necessities, including social and medical visits, and feels less safe in her home.

69.     On information and belief, it is, and at all times relevant herein was Defendants' policy not to hold apartments for qualified prospective tenants who might need an extension as a reasonable accommodation in the

rental application and lease signing process or to accept a per diem holding fee to compensate for such an extension.

70.     On information and belief, it is, and at all times relevant herein was Defendants' policy and practice not to allow qualified prospective tenants to engage in any form of remote signing as a reasonable accommodation.

71.     On information and belief, it is, and at all times relevant herein was Defendants' policy not to engage in a meaningful interactive process in good faith with prospective tenants with disabilities who request reasonable accommodations related to their housing by returning correspondence promptly or allow Plaintiff's counsel to correspond with Defendants' counsel.

72.     The nature of Defendants' discrimination constitutes an ongoing violation of fair housing law. Until Defendants' unlawful practices are enjoined, Plaintiff and other similarly situated persons will continue to be denied full and equal use and enjoyment of housing offered by Defendants to the general public and will suffer ongoing and irreparable injury.

73.     The unlawful practices of the Defendants as described herein were and are wanton, willful, malicious, fraudulent, or oppressive and/or were done in conscious, callous, reckless, or blatant disregard for the federally protected rights of Plaintiff, entitling her to punitive damages.

## FIRST CLAIM
### Fair Housing Amendments Act of 1988
### 42 U.S.C. § 3601 *et seq*.

74.     Plaintiff hereby re-pleads, restates, re-alleges, and incorporates by reference all the allegations contained in the preceding paragraphs.

Complaint

75.     The Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. § 3601 *et seq*., prohibits discrimination in the sale, rental, and financing of dwellings, and in other housing-related transactions, based on several protected characteristics, including disability.

76.     Plaintiff is, and at all times relevant herein was, an individual with a disability as that term is defined by the FHAA and its implementing regulations. 42 U.S.C. § 3602(h); 24 C.F.R. § 100.201.

77.     Defendants are, and at all times relevant herein were "persons" who engage in the "rental" of "dwellings," as those termed as defined by the FHAA and its implementing regulations. 42 U.S.C. § 3602(b), (d), and (e); 24 C.F.R. §§ 100.20 and 100.201.

78.     The Property is a "dwelling" as that term is defined by the FHAA and its implementing regulations. 42 U.S.C. § 3602(b); 24 C.F.R. §§ 100.20 and 100.201.

79.     In acting as herein alleged, Defendants have injured Plaintiff by committing discriminatory housing practices in violation of the FHAA and its implementing regulations. Defendants' unlawful conduct under the FHAA includes, but is not limited to:

    a) Discriminating in the rental, or to otherwise make unavailable or deny, a dwelling to Plaintiff because of disability, 42 U.S.C. §3604(f)(1);

    b) Discriminating in the terms, conditions or privileges of housing, or in the provision of services or facilities in connection with such housing, 42 U.S.C. § 3604(f)(2);

    c) Refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations were necessary to afford Plaintiff equal opportunity to use and enjoy her housing, 42 U.S.C. § 3604(f)(3)(B); and

Complaint

d) Coercing, intimidating, threatening, or interfering with Plaintiff in the exercise or enjoyment of rights granted or protected by FHAA, 42 U.S.C. § 3617.

80.  Plaintiff is an "aggrieved" person within the meaning of the FHAA. 42 U.S.C. § 3602(i)(1). She has been denied a housing opportunity of her choice due to Defendants' failure to provide her with reasonable accommodations for her disabilities and has incurred damages as a result.

81.  Defendants' duties under the FHAA are mandatory and long established. Defendants are deemed to have had knowledge of their duties at all times relevant herein and were provided actual notice of such duties. Defendants' failure to comply with their fair housing obligations was wanton, willful, malicious, fraudulent, or oppressive and/or was done in conscious, callous, reckless, or blatant disregard for the federally protected rights of Plaintiff.

82.  Pursuant to 42 U.S.C. § 3613(c)(1) and (2), Plaintiff prays for judgment as set forth below.

**SECOND CLAIM**

**California Fair Employment and Housing Act**

**California Civil Code §12955 *et seq*.**

83.  Plaintiff hereby re-pleads, restates, re-alleges, and incorporates by reference all the allegations contained in the preceding paragraphs.

84.  The California Fair Employment and Housing Act (FEHA), Cal. Civ. Code §12955 *et seq*. prohibits discrimination in the sale, rental, and financing of dwellings, and in other housing-related transactions, based on several protected characteristics, including disability.

Complaint

85.     Plaintiff is, and at all times relevant herein was, an individual with a disability as that term is defined by California law. Cal. Gov. Code § 12926.

86.     Defendants are, and at all times relevant herein were, "owners" of "housing accommodations" within the meaning of the FEHA. Cal. Gov't Code §§ 12927(d) and (e). Each of the Defendants is also a "person" as defined under FEHA. Cal. Gov't Code § 12927(f).

87.     The Property is a "housing accommodation" within the meaning of FEHA. Cal. Gov't Code § 12927(d).

88.     Under the FEHA, it is discriminatory for a housing provider to refuse to make reasonable accommodations where necessary to afford an individual with a disability an equal opportunity to obtain, use, or enjoy a housing opportunity. Cal. Code Regs. Tit. 2, § 12176(a) and (c).

89.     The FEHA was written to conform California law on the subject of fair housing to the Federal Fair Housing Act. *Broodmore San Clemente Homeowners' Assn. v. Nelson*, 25 Cal.App.4th 1, 5–7, 30 Cal.Rptr.2d 316 (1994). Accordingly, an analysis under the FEHA mirrors an analysis under the FHAA.

90.     Defendants' violation of Plaintiff's rights under FHAA, as set out in Plaintiff's First Claim, also violates Plaintiff's rights under FEHA.

91.     The FEHA also expands, in some areas, the fair housing rights of people with disabilities. Relevant here, the failure to engage in an interactive process expressly violates the FEHA. Cal. Code Regs. Tit. 2, § 12177. By failing to engage in an interactive process with Plaintiff regarding her need for reasonable accommodation, Defendants violated the FEHA.

92.     Plaintiff is an "aggrieved" person within the meaning of the FEHA. Cal. Gov't Code § 12927(g). She has been denied a housing opportunity of her choice due to Defendants' failure to provide her with

Complaint

reasonable accommodations for her disabilities and has incurred damages as a result.

93.    Defendants' duties under FEHA are mandatory and long established. Defendants are deemed to have had knowledge of their duties at all times relevant herein and were provided actual notice of such duties. Defendants' failure to comply with their fair housing obligations was wanton, willful, malicious, fraudulent, or oppressive and/or were done in conscious, callous, reckless, or blatant disregard for Plaintiff's fair housing rights.

94.    Pursuant to Cal. Civ. Code § 12989.2, Plaintiff prays for judgment as set forth below.

**THIRD CLAIM**

**California Unruh Civil Rights Act**

**California Civil Code § 51 *et seq*.**

95.    Plaintiff hereby re-pleads, restates, re-alleges, and incorporates by reference all the allegations contained in the preceding paragraphs.

96.    The Unruh Civil Rights Act ("Unruh Act") provides that individuals with disabilities "are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b).

97.    Plaintiff is a person with a "disability" within the meaning of the Unruh Act. Cal. Civ. Code § 51(e)(1).

98.    The Unruh Act applies with full force to the business of renting housing accommodations. *Marina Point, Ltd. v. Wolfson*, 30 Cal. 3d 721, 731 (1982).

Complaint

99.     Defendants are in the business of renting housing accommodations and therefore must comply with the provisions of the Unruh Act.

100.    The provisions of the Unruh Act protect substantially the same rights as FHAA and are subject to the same analysis.

101.    Defendants' violation of Plaintiff's rights under FHAA, as set out in Plaintiff's First Claim, also violates Plaintiff's rights under the Unruh Act.

102.    Defendants' duties under the Unruh Act are mandatory and long established. Defendants are deemed to have had knowledge of their duties at all times relevant herein and were provided actual notice of such duties. Defendants' failure to comply with their fair housing obligations was wanton, willful, malicious, fraudulent, or oppressive and/or were done in conscious, callous, reckless, or blatant disregard for Plaintiff's civil rights.

103.    Pursuant to Cal. Civ. Code § 52, Plaintiff prays for judgment as set forth below.

### FOURTH CLAIM
### California Disabled Persons Act
### California Civil Code § 54.1(b) *et seq.*
### *(Statutory Damages and Attorney's Fees Only)*

104.    Plaintiff hereby re-pleads, restates, re-alleges, and incorporates by reference all the allegations contained in the preceding paragraphs.

105.    The Disabled Persons Act ("CDPA") provides that "[i]ndividuals with disabilities shall be entitled to full and equal access, as other members of the general public, to all housing accommodations offered for rent, lease, or compensation in this state, subject to the conditions and limitations established by law, or state or federal regulation, and applicable alike to all persons." Cal. Civ. Code § 54.1(b)(1).

21

Complaint

106.   The CDPA also provides that "[a]ny person renting, leasing, or otherwise providing real property for compensation shall not refuse to make reasonable accommodations in rules, policies, practices, or services, when those accommodations may be necessary to afford individuals with a disability equal opportunity to use and enjoy the premises." Cal. Civ. Code § 54.1(b)(3)(B).

107.   Plaintiff is a person with a "disability" within the meaning of the CDPA. Cal. Civ. Code § 54(b)(1).

108.   The Property is a "housing accommodation" within the meaning of the CDPA. Cal. Civ. Code § 54.1(b)(2).

109.   Defendants are persons renting, leasing, or otherwise providing real property for compensation, and are therefore subject to the CDPA, including the CDPA's requirement to provide reasonable accommodations in rules, policies, practices, or services, when those accommodations may be necessary to afford individuals with a disability equal opportunity to use and enjoy the premises. Cal. Civ. Code § 54.1(b)(3)(B).

110.   Defendants violated Plaintiff's rights under the CDPA by denying Plaintiff's request for reasonable accommodation in the lease signing process and denying her the housing opportunity of her choice.

111.   Claims under California Civ. Code § 54.1 are analyzed under the same standards as the analogous provisions of the FHAA. Accordingly, Defendants' violation of Plaintiff's rights under FHAA, as set out in Plaintiff's First Claim, also violates Plaintiff's rights under the CDPA.

112.   Defendants' duties under the CDPA are mandatory and long established. Defendants are deemed to have had knowledge of their duties at all times relevant herein and were provided actual notice of such duties. Defendants' failure to comply with their fair housing obligations was wanton, willful, malicious, fraudulent, or oppressive and/or were done in

conscious, callous, reckless, or blatant disregard for Plaintiff's fair housing rights.

113.   Pursuant to the remedies, procedures, and rights set forth in Cal. Civ. Code § 54.3(a), Plaintiff prays for statutory damages and attorneys' fees.

## FIFTH CLAIM

### Negligence

### California Civil Code § 1714

114.   Plaintiff hereby re-pleads, restates, re-alleges, and incorporates by reference all the allegations contained in the preceding paragraphs.

115.   Defendants injured Plaintiff by want of ordinary care or skill in their ownership and management of their property and agents in violation of Cal. Civ. Code § 1714.

116.   Defendants were negligent because, as described herein, they violated the FHAA, FEHA, Unruh Act, and Disabled Persons Act in their ownership and management of the Property.

117.   On information and belief, Defendants' negligence also includes their failure to train, monitor, and supervise their agents and employees and to ensure their compliance with the FHAA, FEHA, Unruh Act, and Disabled Persons Act.

118.   Defendants' acts and omissions constitute a negligent failure to operate the Property in conformity with the law and with accepted industry customs and standards.

119.   Defendants' negligence was a substantial factor in bringing about the harm suffered by Plaintiff, including out-of-pocket losses, the deprivation of the right to equal housing opportunity, loss of civil rights, loss of use and enjoyment, frustration, difficulty, emotional and physical distress, embarrassment, and inconvenience.

Complaint

120. The FHAA, FEHA, Unruh Act and Disabled Persons Act were intended to prevent acts and omission like those of Defendants.

121. The FHAA, FEHA, Unruh Act and Disabled Persons Act were intended to protect persons like Plaintiff.

122. Wherefore, Plaintiff prays for relief as set forth below.

## PRAYER

WHEREFORE, Plaintiff respectfully requests that this Court:

1. Issue an injunction pursuant to the FHAA, FEHA and Unruh Act:

   a) Ordering Defendants to refrain from taking any further unwarranted and adverse or retaliatory action against Plaintiff as the result of this Complaint (e.g. negative reports to credit agencies) should they later establish a rental relationship with Plaintiff;

   b) Ordering Defendants to adopt and implement objective, uniform, nondiscriminatory standards in management of properties they own and operate, including the Property;

   c) Ordering Defendants to adopt and implement policies for processing reasonable accommodation requests at the Property that are consistent with FHAA and FEHA; and

   d) Ordering Defendants to submit their agents and employees to fair housing training, including training on the housing rights of individuals with disabilities.

2. Award Plaintiff other general, compensatory, and statutory damages in an amount within the jurisdiction of this Court;

3. Award Plaintiff punitive damages according to proof;

24

4.    Award Plaintiff attorneys' fees, litigation expenses, and costs of suit, as provided by law; and

5.    Award such other and further relief as the Court may deem just and proper.

Dated: January 8, 2024

ELDER LAW AND DISABILITY RIGHTS CENTER

By:_____
        Andrea Smith
        Attorney for Plaintiff

Complaint